Eben HOPSON, Sr., Lloyd Ahvakana, and Elijah Rock, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Juanita KREPS, Secretary of Commerce, Richard Frank, Administrator, National Oceanic and Atmospheric Administration, Terry Leitzell, Assistant Administrator for Fisheries, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, and United States of America, Defendants.

No. A78–184 Civil.

United States District Court, D. Alaska.

Jan. 11, 1979.

Stephen DeLisio, of Merdes, Schaible, Staley & Delisio, Inc., Anchorage, Alaska, Charles A. Goldmark, William H. Block, Wickwire, Lewis, Goldmark, Dystel & Schorr, Seattle, Wash., for plaintiffs.

Alexander O. Bryner, U. S. Atty., Anchorage, Alaska, Margaret Strand, Dept. of Justice, Washington, D.C., for defendants.

Joel T. Thomas, Nat. Wildlife Federation, Washington, D.C., amicus curiae.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on cross motions for partial summary judgment. The issue presented by these motions is whether the 1946 International Convention for the Regulation of Whaling, 62 Stat. 1716, (1946 Convention), and the Whaling Convention Act of 1949, 16 U.S.C. §§ 916–916*l* (1976) authorize the regulation of subsistence whaling by Native Alaskans. This case presents complex issues involving the foreign policy of the United States, the interpretation of an international treaty, the fate of an endangered animal that has caught the attention of the world, and the future of an ancient culture that is the epitome of traditional Alaska. This court notes the improbability that any judicial order can "solve" such a troubling and complex dilemma. Nevertheless, the court has been called upon to rule, and such follows hereafter.

*Background*

In 1946, under United States leadership, fifteen nations [1] entered into an international treaty for the purpose of "safeguarding for future generations the great natural resources represented by the whale stocks." Preamble to the 1946 Convention, 62 Stat. at 1716. Previous whaling treaties had failed to reestablish the decimated whale populations, and did not lend themselves to the establishment of seasonal quotas for the taking of whales. This, for the reason that, to establish a new quota, the treaties had to be amended by a formal protocol. *See* 1931 Geneva Convention on the Regulation of Whaling, 49 Stat. 3079, and the International Agreement for the Regulation of Whaling, June 8, 1937, 52 Stat. 1460. *See generally* Scarff, *Whale Management* at 343–58. A more flexible system for establishing quotas was created by the 1946 Convention through the organization of the International Whaling Commission which has the power to amend from time to time a Schedule fixing:

(a) protected and unprotected species; (b) open and closed seasons; (c) open and closed waters, including the designation of sanctuary areas; (d) size limits for each species; (e) time, methods, and intensity of whaling (including the maximum catch of whales to be taken in any

1. As of October, 1976, there were 17 International Whaling Commission members: Argentina, Australia, Brazil, Canada, Denmark, France, Iceland, The Netherlands, Japan, Mexico, New Zealand, Norway, Panama, South Africa, U.S.S.R., United Kingdom, and the United States. Scarff, *The International Management of Whales, Dolphins and Porpoises: An Interdisciplinary Assessment, 6 Ecology Law Quarterly* 326 (Part One), 353 n. 135 (1977) (hereinafter, Scarff, *Whale Management*).

one season); (f) types and specifications of gear and apparatus and appliances which may be used; (g) methods of measurement; and (h) catch returns and other statistical and biological records. Article V, 1946 Convention. 62 Stat. at 1718–19.

The 1946 Convention and necessarily the jurisdiction of the Whaling Commission is limited to "factory ships, land stations, and whale catchers under the jurisdiction of the Contracting Governments, and to all waters in which whaling is prosecuted by such factory ships, land stations, and whale catchers." Article I, 1946 Convention, 62 Stat. at 1717. A Contracting Government can prevent an amendment to the Schedule from applying to it by presenting an objection to the International Commission within ninety days after formal notification of the amendment. Article V, 1946 Convention, 62 Stat. at 1719. The Schedule is implemented in the United States by the Whaling Convention Act of 1949, 16 U.S.C. § 916–916l (1976), which authorizes and directs the Secretary of Commerce to adopt "such regulations as may be necessary to carry out the purposes and the objectives of the convention, the regulations of the Commission [and] this chapter." 16 U.S.C. § 916j.[2]

The bowhead whale (known to the scientists as *Balaena mysticetus*) is one of the most seriously endangered whale species.[3] From the first Schedule adopted by the Contracting Governments at the Conference that wrote the 1946 Convention, bowheads (also called right whales) have been a completely protected species, except for an exemption for subsistence hunting.[4] Begin-

2. 16 U.S.C. § 916j states:

916j. Administration of enforcement provisions.

(a) The Secretary of Commerce is authorized and directed to administer and enforce all of the provisions of this chapter and regulations issued pursuant thereto and all of the provisions of the convention and of the regulations of the Commission, except to the extent otherwise provided for in this chapter, in the convention, or in the regulations of the Commission. In carrying out such functions he is authorized to adopt such regulations as may be necessary to carry out the purposes and objectives of the convention, the regulations of the Commission, this chapter, and with the concurrence of the Secretary of State, to cooperate with the duly authorized officials of the government of any party to the convention.

(b) Enforcement activities under the provisions of this chapter relating to vessels engaged in whaling and subject to the jurisdiction of the United States primarily shall be the responsibility of the Secretary of the Treasury in cooperation with the Secretary of Commerce.

(c) The Secretary of Commerce may authorize officers and employees of the coastal States of the United States to enforce the provisions of the convention, or of the regulations of the Commission, or of this chapter, or of the regulations of the Secretary of Commerce. When so authorized such officers and employees may function as Federal law-enforcement officers for the purposes of this chapter.

16 U.S.C. § 916k states:

916k. Regulations; submissions; publications; effectiveness.

Regulations of the Commission approved and effective in accordance with section 916b of this title and article V of the convention shall be submitted for appropriate action or publication in the Federal Register by the Secretary of Commerce and shall become effective with respect to all persons and vessels subject to the jurisdiction of the United States in accordance with the terms of such regulations and the provisions of article V of the convention.

One authority describes the enforcement scheme in the Convention and Schedule as "national enforcement with international supervision" and has called it "the most detailed national enforcement scheme spelled out in any international agreement." Hayashi, *Soviet Policy on International Regulations of High Seas Fisheries*, 5 Cornell Int'l L.J. 131, 148–55 (1972).

3. Bowhead Whales, A Special Report to the International Commission, U. S. Department of Commerce (NOAA) at 1 (June 1978) (hereinafter Bowhead Report); *See also* FEIS, International Whaling Commission's Deletion of Native Exemption for the Subsistence Harvest of Bowhead Whales, U. S. Department of Commerce (NOAA) at 31–34 (October, 1977) (hereinafter FEIS).

4. The original Schedule, 62 Stat. at 1723, stated:

It is forbidden to take or kill gray whales or right whales, except when the meat and products of such whales are used exclusively for local consumption by the aborigines.

This Schedule was later changed to read:

It is forbidden to take or kill gray whales or right whales, except by aborigines or a Contracting Government on behalf of aborigines and only when the meat and products of such whales are to be used exclusively for local consumption by the aborigines.

ning in 1973 the Scientific Committee of the Commission began to show special concern for the bowhead and in June, 1977, recommended that all bowhead whaling, including subsistence hunting, be prohibited. The Commission accepted the recommendation of the Scientific Committee and voted 17 to 0, with the United States abstaining, to ban all bowhead whaling beginning in 1978.[5] In the ninety days subsequent to the official notification in July, 1977, the government prepared an environmental impact statement concerning whether the United States should file an objection to the Schedule amendment. After extensive comment by Eskimos, Alaskans, scientists, and U. S. officials, the Secretary of State announced that the United States would not object because such an objection would interfere with long-term efforts of the United States to bring a halt to the commercial whaling that has severely reduced all whale populations, including the bowhead. The United States promised to seek reconsideration of the ban at the next Commission meeting. The position of the United States was, and still is, that the Commission must consider cultural and subsistence needs in establishing quotas for such whaling.

The Eskimo whalers filed suit in Washington, D.C., in an attempt to obtain a preliminary injunction requiring the Secretary of State to file an objection to the Schedule change. The Court of Appeals for the D.C. Circuit vacated a preliminary injunction issued by the D.C. District Court. The Circuit Court held that an extraordinary showing on the merits would have to be made when important United States interests in foreign affairs, such as the U. S. policy in the Whaling Commission, would be irreparably harmed by the issuance of an injunction. The Circuit Court found that the plaintiffs had failed to make such a showing. *Adams v. Vance*, 187 U.S.App. D.C. 41, 46, 570 F.2d 950, 955 (1977).

Since the decision not to object to the Schedule, the American delegation has succeeded in obtaining a limited quota for Alaskan Natives. In December, 1977, the Commission modified its complete ban to permit the Eskimo during 1978 to land 12 whales, or strike 18, whichever came first.[6] At the June, 1978, meeting the 1978 quota was raised to 14 whales landed, or 20 struck.[7] At the December, 1978, meeting, the quota for 1979 was raised again to 18 whales landed or 27 struck.[8]

After the June, 1978, meeting of the International Commission, the Eskimo whalers filed suit in this court alleging that the regulations promulgated by the Secretary of Commerce to implement the Schedule were not valid because the International Commission has no jurisdiction over Native subsistence whaling and therefore the Whaling Convention Act of 1949 does not authorize the regulations in question. The whalers' complaint also alleges that the United States has violated its trust responsibility toward Native Alaskans by issuing the regulations and that the regulations violate the Marine Mammal Protection Act, 16 U.S.C. § 1361–1407 (1976), and the Endangered Species Act, 16 U.S.C. §§ 1531–43 (1976). The cross motions before the court at this time raise only the issue of the first claim, that concerning the 1949 Whaling Convention Act. The question here can be reduced to whether the Eskimos' small boats fit within the 1946 Convention's and

Plaintiffs' Appendix I, p. 4.

5.  At the time of the June, 1977 decision by the Commission, the Scientific Committee estimated the Bering Sea bowhead population to be between 1,000 and 1,600. The initial population was estimated to be 11,700 (c. 1850). It is the practice of the Committee to recommend protection of any species that has fallen to a level of 60 per cent of its original size. The Bering Sea bowhead were estimated to be only 10 per cent of their original size. In 1976 and 1977 the Eskimo harvest of bowheads (including whales struck but lost) was 91 and 105,

respectively. FEIS at 18–19. Since the June, 1977, research has indicated a new estimate of 2,264 whales in the Bering Sea. Since June 1977, through the efforts of the government and the Alaska Eskimo Whaling Commission, measures have been taken to reduce the struck but lost rate. Bowhead Report at 26, 51–53.

6.  43 Fed.Reg. 13383 (April 3, 1978) as amended 43 Fed.Reg. 22213 (May 24, 1978).

7.  43 Fed.Reg. 43309 (Sept. 25, 1978).

8.  U. S. Exhibit F at 2.

the 1949 Act's definition of "whale catcher." Article II of the Convention defines whale catcher as "a ship used for the purpose of hunting, taking, towing, holding on to, or scouting for whales." 62 Stat. at 1717. The 1949 Act uses the term "vessel" instead of "ship" in its definition of "whale catcher". "Vessel" under the 1949 Act is defined broadly as "every kind, type, or description of water craft or contrivance subject to the jurisdiction of the United States used, or capable of being used, as a means of transportation." 16 U.S.C. § 916(e), (h).

The plaintiffs emphasize that they and their ancestors have hunted the bowhead for thousands of years, and whale products remain an essential source of food for many of them. The government concedes the importance of whaling to the plaintiffs and their villages, but contends that the interpretation of 1946 Convention embraced by the United States is so intertwined with foreign policy considerations that this court has no jurisdiction to consider the validity of the regulations that implement the Commission's Schedule. Before the court examines the applicability of the foreign relations aspect of the "political question" doctrine, the relationship of United States foreign policy and the issue before the court must be examined.

*United States Policy in the International Commission*

The United States decision to accept the International Whaling Commission's decision that Native subsistence is within the jurisdiction of the Commission was based on the diplomatic problems that would be created if the United States opposed the only action of the Whaling Commission in recent years to have an impact in the United States. Ever since the 1972 United Nations Conference on the Human Environment at which a United States resolution to protect whales won overwhelming approval, the United States has taken a leadership role in international efforts to conserve whales.[9] John D. Negroponte, Deputy Assistant Secretary of State for Oceans and Fisheries, is the State Department official most directly responsible for U. S. foreign policy on international cooperation for the conservation of whales. Mr. Negroponte's affidavit[10] states in relevant part:

2. As a party to the International Whaling Convention of 1946 and a member of the International Whaling Commission created by that convention, the United States has been a leading advocate for the conservation of whales. As a result of U. S. efforts and with the cooperation of other nations in the International Whaling Commission, the number of whales taken commercially has been reduced substantially in recent years.

.    .    .    .    .

10. If enforcement of the United States regulations were enjoined, it is my understanding that the further damage to the bowhead whale stock could be irreparable. In any case, other countries would be likely to blame the United States for any decline in the condition of the bowhead whale stocks.

11. I further believe that, regardless of the effect on the bowhead whale stocks, an injunction against enforcement of the regulations governing the bowhead whaling hunt on the grounds that the Convention does not apply to aboriginal whaling would seriously damage United States efforts to achieve and maintain an effective program for the conservation of whales. Despite isolated statements by certain country representatives at the Conference which drafted the Convention expressing doubt that particular instances of aboriginal whaling were covered, the jurisdiction of the International Whaling Convention over aboriginal whaling has never, to my knowledge, been questioned by any *party* to the Convention since its entry into force. The

---

9. U. S. Exhibit A, p. 6, Affidavit of William Aron (Originally submitted to the Court of Appeals for the District of Columbia). Mr. Aron was appointed U. S. Commissioner to the International Whaling Commission by the President in 1977 and was head of the U. S. Delegation to the June, 1977 meeting that banned all bowhead whaling.

10. U. S. Exhibit C.

position of the United States Government at the Commission has clearly been that the Convention applies to aboriginal whaling. This view has most recently been evidenced by the casting of the United States vote in favor of adopting a bowhead whale quota in the Schedule at the Commission meetings in December 1977 and June 1978. If the United States were to cease enforcing the bowhead whale quota now, on the grounds that the Convention does not apply to aboriginal whaling, other countries could accuse the United States of violating an international obligation, and of hypocrisy in suggesting a completely new interpretation of the Convention at a time when there is significant internal political pressure in the United States to do so.

12. Such perceptions could undermine United States efforts to conserve whales. As was noted in the affidavit of Patsy T. Mink in the case of *Adams v. Vance*, the United States has exerted considerable pressure on other countries to sacrifice domestic interests to the cause of ensuring the conservation of whales. For example, the United States has several times threatened to invoke the Pelly Amendment, which permits imposition of an embargo against countries whose nationals or actions threaten the effectiveness of International Whaling Commission programs of whale conservation, against a country which filed an objection to or refused to enforce a quota established by the Commission. United States leadership and pressure has been instrumental in preventing objections by whaling nations and in encouraging nations who were not previously members to join the Commission. No country has objected to a quota established by the Commission since 1973, even though several, particularly the Soviet Union and Japan, have experienced socio-economic dislocation as a result of the decline in the size of commercial quotas. Recently, in response to the United States' urging, Korea, Chile and Peru have announced their intention to join the Commission.

13. An injunction against enforcement of the bowhead whale quota would detract from our ability to convince other nations to cooperate in the conservation of whales, as the United States would be subject to a charge that it was undermining the conservation program of the Commission. At the same time, the United States would be providing a convenient precedent for other countries to relax enforcement of Commission quotas against their own citizens or to object to such quotas. It is possible that an injunction against enforcement of the bowhead whale quota could pave the way for a series of failures to enforce or a number of objections which would seriously harm the Commission's conservation program. This, in turn, could result in the extinction of many species of whales, precluding any possibility of even limited subsistence whaling for Alaskan Natives, or future generations.

14. I do not believe that the potential damage to the conservation of whales would be less because the action of the United States was imposed by order of a court. In my view, a failure to enforce will be viewed as the action of the United States Government, whether it results from the decision of the Executive Branch, the Congress, or the Federal Courts.

U. S. Exhibit C, p. 1, 5–7 (emphasis in original).

Mr. Negroponte's affidavit has been quoted at length because it summarizes the factual basis for the claim that an order of this court holding that the International Whaling Commission has no jurisdiction over subsistence whaling would directly and substantially interfere with U. S. foreign policy. Other affidavits in the record by officials involved in U. S. policy in the Whaling Commission amplify and support the position of the government.[11] At oral argu-

---

11. The affidavit of Prudence Fox, a foreign affairs officer who has been on the U. S. delegation to the International Commission for eight years, states:

ment the government stated that the policy as outlined by Mr. Negroponte has the approval of the President.

That the State Department's perception of the consequences of the failure to enforce the provisions of the Schedule on bowhead whaling has a basis in fact and is not simply an attempt to shield government action from scrutiny is indicated by the statement of Mr. Lemche, the Danish Commissioner, at the June, 1977, meeting of the Commission. He stated in response to the U. S. Delegation's abstention on the bowhead issue:

> I think I now understand that there is consistency in the U. S. government's policy—only there seems to be inconsistency between the U. S. policy and the ability of the U. S. to police its policy. The U. S. referred to the problems of imposing unpopular federal policy on eskimos in Alaska. The eskimos in Greenland are, on the other hand, obliged to adhere to unpopular conservation measures regarding an-

> The U. S. has maintained that the well being of all whale stocks worldwide is the concern of the Commission. A ruling that aboriginal whaling was not within the Commission's jurisdiction would weaken the credibility of the United States position since it would state, in effect, that although we want to have an input in conservation measures for whales taken by all nations worldwide, they cannot have an input into conservation measures for the endangered Bering Sea stock of bowhead whales taken by Americans. Such a loss of credibility will lessen the ability of the United States to seek improved conservation measures within the IWC. Further, other nations could claim that they, too, should be able to regulate their own whaling operations, particularly within their 200 miles resource zones; I believe they might use a court ruling that the IWC had limited authority as an opportunity for asserting such self-regulation of whaling.

U. S. Exhibit NN, p. 2–3.

The affidavit dated December 30, 1978, of William Aron, who was head of the U. S. delegation to the June, 1977 meeting of the International Whaling Commission states:

> I believe that the U. S. credibility would be severely diminished, since we would be, in effect, telling the IWC that it could not regulate to conserve whales hunted by our citizens. Other nations could then raise their own domestic concerns as grounds for refusing to accept IWC regulations. For example, at the December 1978 meeting of the IWC, Japan compared the problems it faces

other species, salmon, measures which by the way were imposed on Denmark by the U. S. Which proves that the U. S. government at least has strength in some conservation measures.

> I find myself in a very different position. If the proposal of the Scientific Committee is carried, which I certainly hope, I have to go back and tell the Greenlanders, who have taken only one bowhead in the last 5 years, that the Greenlanders are not allowed to take even a single Greenland whale (which is our name for the bowhead) because the U. S. cannot implement an international agreement of last year, and at the same time that the Greenlanders still are bound by an international agreement on salmon (ICNAF). No wonder if the Greenlanders would say: if the U. S. can disregard an agreement about this endangered species, why should we obey the U. S. imposed quota on salmon which is certainly not endangered?

> as a result of the IWC establishing lower sperm whale quotas, to the bowhead whale problem since its citizens rely on the whaling for employment, food and sustenance. If a United States court holds that the IWC jurisdiction is limited to the exclusion of aboriginal whaling, I believe some nations may take the opportunity to assert that the IWC is limited in other ways with the result that quotas based on scientific procedures become meaningless. The U. S. would no longer have the credibility or integrity to insist that nations abide by the quotas if it had, through whatever means, removed its only whaling operation from IWC jurisdiction.

U. S. Exhibit PP, p. 2–3.

Dr. Gerard Bertrand, a member of the Scientific Committee of the Whaling Commission from April, 1976 to June, 1978 states in his affidavit:

> The present understanding among members of the Scientific Committee and scientists involved with whaling is that the term "whale catcher" includes any vessel used as a platform for catching and killing whales. If the term "whale catcher" were held to mean only the upper end of the size range of whaling vessels, the IWC would not be able to regulate effectively whaling by Japan, Norway, Canada, Iceland, Spain and other countries which use or have used small coastal whaling vessels.

U. S. Exhibit OO, p. 3.

To such a question I will have no answer. U. S. Exhibit KK. This statement of the Danish Commissioner indicates that failure to obey the Schedule promulgated by the Commission may have serious foreign policy implications beyond whale conservation efforts of the United States, and extend to other international fishery management efforts.

In response to the contentions of the government that an order of this court could interfere with U. S. foreign policy, the plaintiffs have submitted affidavits from individuals who are not presently in the Executive branch and therefore are not in as good a position to assert a determination of U. S. policy or the effect of an order of this court. The most substantial of these affidavits is the affidavit of Patsy Mink, former Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs. The court in *Adams v. Vance* had quoted at length from an affidavit of Mrs. Mink submitted in that case. Her affidavit before the court states that her analysis in the *Adams v. Vance* affidavit "was limited to an analysis of the implications of an executive decision not to abide by a decision of the International Whaling Commission." But it goes on to state that:

> While I do not attempt to analyze the effects of a court order declaring that the International Whaling Convention of 1946 does not authorize regulation of Native subsistence whaling, it is my belief that the international community can and does distinguish between decisions made by federal courts and decisions made by the executive branch of the United States Government.

Mink affidavit (Docket # 62)

The court finds the generalized observation of the Mink affidavit insufficient to overcome the detailed analysis of present officers of the government, such as is represented by the Negroponte affidavit. The court finds that the defendants have established by substantial evidence that the issue presented to this court is directly linked to an important United States position in for-

eign relations, and that an order of this court on that issue would embarrass, if not destroy that position.

*The Foreign Relations Political Question*

In *Jensen v. National Marine Fisheries Service,* 512 F.2d 1189 (9th Cir. 1975), the Ninth Circuit Court of Appeals was presented with a case that is nearly the parallel of this one. The fishermen in *Jensen* challenged the validity of regulations approved under the Northern Pacific Halibut Act of 1937, 16 U.S.C. §§ 772–772j (1976). This Act provides the procedure for the domestic implementation of U. S. obligations under the Convention Between the United States and Canada for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea. Under this treaty the International Pacific Halibut Commission promulgates regulations governing the halibut fishery which are approved or disapproved by the Executive branch. The *Jensen* court found that the approval of the regulations was agency action in the field of foreign affairs that was committed to executive discretion and therefore nonreviewable. The case was dismissed for lack of subject matter jurisdiction.

■ In determining that the halibut regulations were nonreviewable the court engaged in an analysis similar to that used by courts to decide whether the "political question" doctrine bars judicial intervention. Justiciability and reviewability are distinct concepts that become entwined in challenges to agency action in foreign affairs. The nonjusticiability of "political questions" is a constitutional principle which states that "the conduct of foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1923). Even if such a question was framed in such a way as to create a justiciable case or

controversy, the same separation of powers doctrine reverses the normal presumption that Congress intended to grant the court the jurisdiction to review such agency action. L. Jaffe, Judicial Control of Administration Action 363 (1965). *See Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). Unless the Congress has expressly determined that such decisions are reviewable they are committed by law to the Executive. As the Court has stated:

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Chicago & Southern Air Lines, Inc. v. Waterman Steamship Co.,* 333 U.S. at 111, 68 S.Ct. at 436.

Determining the possible consequences of judicial action in this case involves "large elements of prophecy" more appropriate for the Executive who has the responsibility and the resources to determine the relationship between the bowhead whale regulations and other aspects of American foreign policy. As the court stated in *Adams v. Vance*:

> This country's interests in regard to foreign affairs and international agreements may depend on the symbolic significance to other countries of various stances and what is practical with regard to diplomatic interaction and negotiation. Courts are not in a position to exercise a judgment that is fully sensitive to these matters.

187 U.S.App.D.C. at 46, 570 F.2d at 955. Even a decision of this court that "whale catchers" include the Eskimo umiak may lock the government into a position it would find difficult to reverse in the future. The case of *Baker v. Carr* has provided the court with a checklist that signals the presence of a political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

■ Nearly all of these factors are present in this case; any one would justify application of the political question doctrine. As the Court has noted above, the Constitution commits foreign relations to the Executive and Legislative branches; an injunction against enforcement of the bowhead regulations would not only be an expression of disrespect for the Executive in an area where it is more competent but would also embarrass U. S. policy and confuse even sophisticated observers of the U.S. government; and most importantly, the progress that the government has made in convincing the Commission to allow a limited bowhead hunt requires adherence to the political decision that has already been made. This, then, is one of those issues "so closely related to a complex of decisions not within the court's jurisdiction that the resolution by the court would either be poor in itself or would jeopardize sound decisions in

the larger complex." L. Jaffe, Judicial Control of Administrative Action, at 492.

The political question doctrine does not indicate that the courts have found an excuse for tolerating lawlessness. Under our system the courts are not the only interpreters of the law. The plaintiffs' claim that the law is being ignored because of "expediency" loses sight of the undeniable proposition that the separation of power is itself a part of our law, and requires that some "legal" decisions are not to be made by courts. See Jaffe at 492.

The plaintiffs have contended that where treaties are implemented domestically and will result in criminal penalties, the political question doctrine does not apply. *Jensen v. National Marine Fisheries Service, supra,* cannot be distinguished on either ground.

Nothing in this opinion should be interpreted as insensitivity to the hardships that may be caused the Native people of Alaska by the quotas imposed on bowhead hunting. As the plaintiffs have demonstrated by their formation of the Alaska Eskimo Whaling Commission, the fate of their endangered culture is tragically linked to the survival of the endangered whale. The government's policy of enforcing the bowhead quota also includes working within the International Commission to obtain a quota more compatible with Eskimo nutritional and cultural needs. Since June, 1977, this policy has produced a reversal of the complete ban on bowhead hunting and two increases in the original quota. Continued tolerance of the subtleties and pace of diplomacy may bring an increased quota and at the same time preserve the population of whales essential for the continued vitality of the whaler's culture.

In conclusion, the court holds that the regulations promulgated to enforce the Schedule of the International Whaling Commission are so directly linked to the conduct of U. S. foreign relations that this court lacks the subject matter jurisdiction to review their validity.

The partial summary judgment motions presented by the parties go to the merits of the validity of the challenged regulations. Rather than grant or deny these motions, the proper procedure is for the court, on its own motion, to dismiss this action without determination of the merits.

Accordingly, IT IS ORDERED:

1. THAT the above cause is dismissed in its entirety for want of jurisdiction.

2. THAT the clerk may prepare an appropriate judgment form.