UNITED STATES of America, Plaintiff-Appellee,

v.

Craig DECKER, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Raymond W. MARRIOTT, Defendant-Appellant.

Nos. 77–3961, 78–1987.

United States Court of Appeals, Ninth Circuit.

May 2, 1979.

Rehearing Denied July 9, 1979.

Charles E. Yates, William J. Bender, Seattle, Wash., for defendants-appellants; Moriarty, Mikkelborg, Broz, Wells & Fryer, Seattle, Wash., on rehearing.

Donald M. Currie, Asst. U. S. Atty., Seattle, Wash., Kathryn Oberly, Washington, D. C., for plaintiff-appellee; John C. Merkel, U. S. Atty, Seattle, Wash., on rehearing.

* Of the Northern District of California.

1. Decker's appeal was once consolidated with *Purse Seine Vessel Owners Ass'n v. United States Dep't of State*, 584 F.2d 931 (9th Cir. 1978), but was then severed. In *Purse Seine*, non-Indian commercial fishermen sought declaratory and injunctive relief to prevent ex-

Before WRIGHT and GOODWIN, Circuit Judges, and SPENCER M. WILLIAMS, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

Decker and Marriott are non-Indian commercial fishermen who were caught fishing on different days in restricted Fraser River convention waters in violation of 16 U.S.C. § 776a (1976). They fished on days permitted for Indians but proscribed for non-Indians. They were convicted in separate trials and sentenced to 60 days imprisonment. Although they pursued separate appeals, the cases were heard together at oral argument. Because they present similar challenges to their convictions, we consolidated the cases for purposes of disposition.[1] We affirm.

## I.

## BACKGROUND

The United States and Canada ratified a convention in 1937 "for the protection, preservation and extension of the sockeye salmon fishery of the Fraser River system." 50 Stat. 1355 (1937). The convention was amended in 1957, adding a number of important paragraphs and including pink as well as sockeye salmon within its scope. [1957] 8 U.S.T. 1057.

The convention established the International Pacific Salmon Fisheries Commission (IPSFC or Commission) to propose annual regulations to achieve two goals: sufficient escapement of the salmon each year to preserve the fishery and equal division of the

emption of Indians from regulations governing salmon fishing in Fraser River convention waters. The district court denied their motions for preliminary injunctions and we affirmed. For reasons discussed *infra, Purse Seine* is helpful here but not clearly dispositive of all issues.

harvestable catch between Canadian and American fishermen. Article VI of the convention provides that these regulations are

subject to approval of the two Governments with the exception of orders for the adjustment of closing or opening of fishing periods and areas in any fishing season and of emergency orders required to carry out the provisions of the Convention.

8 U.S.T. at 1060. Under 16 U.S.C. § 776a (1976), it is unlawful to fish in violation of any IPFSC regulation.[2]

In an effort to comply with the requirements of *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974), *aff'd* 520 F.2d 676 (9th Cir. 1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976),[3] the United States in March 1977 secured the Canadian government's permission to provide treaty Indians with longer fishing periods.

Anticipating rejection of this proposal by the Commission, the State Department advised the Canadian government in May that it might achieve the same result by using its power under article VI of the convention to approve IPSFC regulations only as applied to non-Indians and by promulgating separate regulations for Indians. Canada did not object.[4]

The Commission disregarded the United States' suggestion for treaty Indians and issued proposed regulations on June 1 covering all American fishermen. The Department of Commerce announced on June 14 that "the United States, acting through the Department of State, has approved the regulations (except as to treaty Indians exer-

cising treaty-secured fishing rights at the tribe's usual and accustomed grounds and stations)." 42 Fed.Reg. 30,841–42 (1977). On June 21, the Department of the Interior, under its authority over Indian affairs, 25 U.S.C. §§ 2, 9 (1976), published regulations governing treaty Indians that generally followed those of the IPSFC, but allowed the Indians a longer fishing period each week.

On June 27, the IPSFC responded to the exemption of treaty Indians by purporting to adopt an "emergency order" stating that its June 1 regulations for American convention waters applied to all citizens, without exception. The United States ignored this order.

## II.

### ISSUES

Appellants challenge their convictions by asserting, under several different theories, that the regulations underlying their convictions are invalid. Before responding to these arguments in its briefs, the government raises the question of justiciability. Thus, we face the following issues:

1. Does the "political question" doctrine make these cases nonjusticiable?

2. Could the United States properly approve the 1977 IPSFC regulations only in part?

3. What effect did the Commission's "emergency order" have on the regulations and appellant's convictions?

4. Did Canada's failure to approve officially the regulations for United States convention waters invalidate them?

---

**2.** 16 U.S.C. § 776a (1976) provides:

It shall be unlawful for any person to engage in fishing for sockeye salmon or pink salmon in convention waters in violation of the convention or of this chapter or of any regulation of the Commission.

**3.** Treaties between the United States and several Northwest Indian tribes guaranteed the Indians the right to fish "at all usual and accustomed grounds and stations . . . in common with all citizens of the Territory." 10 Stat. 1132, 1133 (1854). *See also* 12 Stat. 927, 933, 951, 971 (1855). The district court interpreted this right as ensuring the opportunity to

take one-half of the harvestable salmon that return to the Indians' traditional fishing grounds. We affirmed.

**4.** Canada "did stress the importance of regulating any special Indian fishery adopted by the United States 'in a manner consistent with the objectives of the Convention and the rights and obligations of the parties thereunder,' " *Purse Seine*, 584 F.2d at 933, but did not object to the exemption of treaty Indians as long as the objectives of the Convention were not adversely affected.

## III.

## DISCUSSION

### A. Justiciability.

The government maintains that the decision to approve the regulations except as pertaining to treaty Indians was an exercise of the State Department's foreign affairs prerogative and therefore is not subject to judicial review. *See, e. g., Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *The Chinese Exclusion Case,* 130 U.S. 581, 32 L.Ed. 1068 (1889); *Jensen v. National Marine Fisheries Service,* 512 F.2d 1189 (9th Cir. 1975).

The government relies primarily on *Jensen v. National Marine Fisheries Service* for its justiciability argument. *Jensen* is similar to these cases in that it involved regulations promulgated by the International Pacific Halibut Commission, also established by a convention between the United States and Canada. The regulations were subject to approval by both countries.

When fishing boat owners and operators challenged the approval of one regulation, we affirmed the district court's dismissal for lack of jurisdiction, holding that "such decisions are political in nature and therefore do not present a justiciable 'case or controversy' within the meaning of Article III of the Constitution." 512 F.2d at 1191.

*Jensen* is distinguishable. There, the claim was that executive approval of the regulation had been arbitrary, while no one disputed that the power to approve was clearly conferred by the convention.[5] Here, the appellants maintain that the regulations underlying their convictions are invalid because the United States did not have the power to approve them selectively. The authority to make such a partial approval is not expressly conferred by the convention, thus raising an issue of its interpretation.

It is the role of the judiciary to interpret international treaties and to enforce domestic rights arising from them. *See, e.g., Kolovrat v. Oregon,* 366 U.S. 187, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961); *Perkins v. Elg,* 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320 (1939); *Charlton v. Kelly,* 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886). In those few cases involving interpretation of treaties when the political question doctrine precludes review, that doctrine has narrow confines. The principal area of nonjusticiability concerns the right of the executive to abrogate a treaty. *See Charlton v. Kelly,* 229 U.S. at 472–76, 33 S.Ct. 945; *The Chinese Exclusion Case,* 130 U.S. at 602–03.[6] That is not the issue here.

5. The *Jensen* court's conclusion that the issues before it were nonjusticiable rested equally on the conclusion that the court lacked jurisdiction under the Administrative Procedure Act (APA) and on the finding that the plaintiffs had not shown actual injury of the sort necessary to create a case or controversy. The court mentioned the political question doctrine to bolster its conclusion that the Secretary of State's action in approving the regulations was of a sort "committed to agency discretion by law" within the meaning of the APA, 5 U.S.C. § 701(a), and that the court therefore lacked jurisdiction. 5 U.S.C. §§ 702, 704. The holding as to jurisdiction was that the challenged action of the Secretary was not reviewable under the APA, the only jurisdictional basis which had been asserted in that case. 512 F.2d at 1191.

6. Even when the continuing validity of a treaty is at issue, the judiciary may determine whether or not an abrogation has been declared and may interpret the effect of an abrogation by the executive branch. The Supreme Court commented in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962):

> [I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action. For example, though a court will not ordinarily inquire whether a treaty has been terminated, since on that question "governmental action . . . must be regarded as of controlling importance," if there has been no conclusive "governmental action" then a court can construe a treaty and may find it provides the answer. Compare *Terlinden v.*

[4] *Jensen* is also distinguishable because plaintiffs there were seeking declaratory and injunctive relief from the adverse economic effects of the challenged regulation.[7] Here, defendants have been convicted in a criminal proceeding for violation of Commission regulations. The validity of the regulations is a prerequisite to the validity of the convictions.

Even if in other respects a traditional political question analysis could apply, we would be reluctant to declare these cases nonjusticiable because such a holding would prevent us from reviewing the propriety of appellants' convictions and prison sentences. We are less inclined to withhold review when individual liberty, rather than economic interest, is implicated.[8]

We conclude that the question whether the United States could partially approve the IPSFC regulations presents a justiciable issue under this set of facts. It follows that

the effect of the Commission's emergency order and the lack of Canada's official approval of the regulations are also justiciable.

## B. *Partial Approval of IPSFC Regulations.*

■ Decker maintains that the United States failed to approve the regulations by attempting to approve them only partially and therefore that his conviction must be reversed because there were no valid regulations to violate. He argues that the treaty could not have contemplated partial approval because the resulting system of dual regulation is inconsistent with the treaty's purposes of assuring sufficient escapement of salmon to preserve the fishery and of achieving an equal division of the harvestable catch between Canadian and American fishermen.[9] He also asserts that this

*Ames*, 184 U.S. 270, 285, 22 S.Ct. 484, 490, 46 L.Ed. 534, with *Society for the Propagation of the Gospel in Foreign Parts v. New Haven*, 8 Wheat. 464, 492–495, 5 L.Ed. 662. Though a court will not undertake to construe a treaty in a manner inconsistent with a subsequent federal statute, no similar hesitancy obtains if the asserted clash is with state law. Compare *Whitney v. Robertson*, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386, with *Kolovrat v. Oregon*, 366 U.S. 187, 81 S.Ct. 922, 6 L.Ed.2d 218.

369 U.S. at 211–12, 82 S.Ct. at 707 (footnote omitted). When it is uncertain whether or not a treaty continues in force, a court may undertake the task of reconciling it with the subsequent action of the executive and legislative branches. *Clark v. Allen*, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947) (determination of whether treaty was compatible with subsequent congressional statute, with another treaty, and with national policy in time of war).

7. The relief sought in *Jensen* was similar to that sought in *Purse Seine*. Although the parties in *Purse Seine* also raised the issue of justiciability under the political question doctrine, this court did not explicitly reach that issue.

8. We realize that the district court for the District of Alaska recently reached a different conclusion in an analogous factual situation dealing with the validity of regulations promulgated under the International Convention for the Regulation of Whaling, 62 Stat. 1716 (1946). *Hopson v. Kreps*, 462 F.Supp. 1374 (D.Alas.1979). The *Hopson* court concluded that *Jensen* was

directly applicable and that the political question doctrine denied the court of subject matter jurisdiction. It dismissed without elaboration the plaintiffs' attempts to distinguish *Jensen*:

The plaintiffs have contended that where treaties are implemented domestically and will result in criminal penalties, the political question doctrine does not apply. *Jensen* . . . cannot be distinguished on either ground.

*Id.*, 462 F.Supp. at 1383.

We disagree with this conclusion for the reasons outlined in the text.

9. Decker argues that selective approval of the regulations is inconsistent with the treaty because it would violate "mutuality of contract." He maintains that mutuality is lacking because "what the United States 'accepted' was not what the Commission proposed." The "contract" here, however, is between the United States and Canada; the IPSFC is not a party.

After he filed his brief, Decker moved under Fed.R.Evid. 201 that we take judicial notice of the testimony of John Roos, Assistant Director of the IPSFC, given in four consolidated criminal cases in which the defendants challenged regulations promulgated by the Department of the Interior for the 1978 season. Roos testified about the difficulties inherent in "dual agency management" for convention waters.

Fed.R.Evid. 201 provides in part:

(a) Scope of rule. This rule governs only judicial notice of adjudicative facts.

(b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally

court's decree in *United States v. Washington* mandates that treaty Indians be subject to IPSFC regulations.

■ Exemption of treaty Indians from the 1977 IPSFC regulations was not inconsistent with the convention. Article VI merely states that the regulations are "subject to approval of the two Governments." It does not state that each country is limited to approval or disapproval in whole, rather than in part. As long as the objectives of the convention were not impeded, we cannot say the United States violated the treaty here by approving Commission regulations only in part.[10]

Regulations promulgated by the Department of the Interior for treaty Indians, although allowing them longer fishing periods, tracked the Commission's regulations in

order to be responsive to the IPSFC need to meet spawning requirements and to prevent or correct any imbalance in the division of catch between the two countries.[11] The Department also undertook other measures to avoid impeding convention objectives.[12] The only reason the State Department selectively approved IPSFC regulations was to allocate the United States' share of fish among American fishermen. We are unpersuaded that this reallocation threatened the goals of the convention.[13]

■ The attitude and practice of Canada is also relevant in determining whether partial approval of regulations is permissible under the convention because, when the meaning of a treaty provision is in doubt, a court may look to the practical construction

known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

If this testimony constitutes "adjudicative facts," we conclude that Roos' opinions are in "reasonable dispute" because they are not "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Therefore, we deny the motion to take judicial notice of Roos' testimony.

**10.** Our decision in *Purse Seine* is relevant here. The district court held that the convention did not give the IPSFC "the authority to direct the domestic allocation of the fishery allotted to the United States" and that the division of the United States' share of the fishery is the government's responsibility. No. C77–471M, slip op. at 3–4 (W.D.Wash. July 8, 1977) (order denying motion for preliminary injunction).

Although affected in our disposition by the appeal pending before the Supreme Court in *United States v. Washington*, we considered the fishermen's likelihood of success on the merits and affirmed the district court, concluding that it "did not abuse its broad discretion in denying injunctive relief to the non-Indian fishermen." 584 F.2d at 934. Although not necessarily conclusive of the issue here, our holding discredits the appellants' argument that the government could not partially approve IPSFC regulations.

**11.** During the 1977 salmon fishing season, when the IPSFC issued several emergency orders for the adjustment of closing or opening of fishing periods and areas, the Department of the Interior issued similar emergency orders for treaty Indians. For example, on July 22 the

IPSFC issued an order reducing the fishing period to one day during the week of July 25, instead of the two days that would otherwise have been allowed. In response, the Interior Department reduced the fishing period for treaty Indians from three days to two.

**12.** The government's brief in Decker's appeal summarizes some of the measures taken:

[The Interior and Commerce] Departments appointed field and headquarters representatives to monitor the Indian fishery, make emergency adjustments as needed, and assure full reporting of the Indian catch to the IPSFC. A hotline system was established to permit immediate telephone notice to the concerned tribes of regulatory changes. Further, the Department of State requested the IPSFC to cooperate fully with Interior and Commerce to facilitate the exchange of information necessary to ensure that the Convention goals are met. Finally, the State Department's selective approval of the IPSFC regulations excepted only those treaty Indians fishing in accordance with Interior's regulations. Thus, treaty fishermen who violated the regulations applicable to them subjected themselves to the same clear enforcement authority of the Sockeye Salmon or Pink Salmon Fishing Act of 1947, 16 U.S.C. § 776 *et seq.*, applicable to non-Indians who violated the IPSFC regulations.

**13.** For a recent commentary on the interrelationship of the Indian treaties and the convention that expresses a contrary view, see Comment, Accommodation of Indian Treaty Rights in an International Fishery: An International Problem Begging for an International Solution, 54 *Wash.L.Rev.* 403 (1979).

placed upon it by the parties as an aid to interpretation. *Pigeon River Improvement Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138, 158, 54 S.Ct. 361, 78 L.Ed. 695 (1934).

Canada did not object to the United States' partial approval of regulations affecting American fishermen. This is not surprising since "Canada has always excluded its Indian fishing from Commission coverage." *Purse Seine Vessel Owners Ass'n v. United States Dep't of State*, 584 F.2d 931, 933 n.1 (9th Cir. 1978).

Both Decker and Marriott maintain nevertheless that this court has already determined treaty Indians must abide by IPSFC regulations. In *United States v. Washington*, 520 F.2d at 690, we said:

Congress sufficiently indicated its intent that all persons, including Indians, be subject to Commission regulations . . .

■ This passage does not sustain the appellants' argument. Under article VI of the convention, regulations for American convention waters are not effective unless they are approved by the United States. An unstated but necessarily implied condition precedent to applying IPSFC regulations to treaty Indians is that they are first properly approved. To hold otherwise would interpret the quoted language as requiring American fishermen to abide by any and all Commission regulations even if the government exercised its lawful article VI right to reject them.

■ Marriott argues that enforcement of IPSFC regulations that exempt treaty Indians is arbitrary governmental action that deprives him of equal protection of the law. This contention is without merit.

Traditional equal protection analysis, which requires a compelling state interest to justify invidious racial discrimination, does not apply to legislation or governmental action favoring Indians. As the Supreme Court noted in *Morton v. Mancari*, 417 U.S. 535, 552–53, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974):

Literally every piece of legislation dealing with Indian tribes and reservations . . . single out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized. See *Simmons v. Eagle Seelatsee*, 244 F.Supp. 808, 814 n.13 (E.D. Wash.1965), aff'd, 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480 (1966).

The propriety of preferential treatment for Indians, particularly when based upon treaty obligations, is rooted in the constitution [14] and has found frequent expression in Supreme Court opinions.[15] "As long as the special treatment [for Indians] can be tied rationally to the fulfillment of Congress'

---

**14.** The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself. Article I, § 8, cl. 3, provides Congress with the power to "regulate Commerce . . . with the Indian Tribes," and thus, to this extent, singles Indians out as a proper subject for separate legislation. Article II, § 2, cl. 2, gives the President the power, by and with the advice and consent of the Senate, to make treaties. This has often been the source of the Government's power to deal with the Indian tribes.

*Mancari*, 417 U.S. at 551–52, 94 S.Ct. at 2483.

**15.** On numerous occasions this Court specifically has upheld legislation that singles out Indians for particular and special treatment.

See, *e. g., Board of County Comm'rs v. Seber*, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943) (federally granted tax immunity); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (same); *Simmons v. Eagle Seelatsee*, 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480 (1966), aff'g 244 F.Supp. 808 (E.D.Wash. 1965) (statutory definition of tribal membership, with resulting interest in trust estate); *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (tribal courts and their jurisdiction over reservation affairs). Cf. *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (federal welfare benefits for Indians "on or near" reservations).

*Mancari*, 417 U.S. at 554–55, 94 S.Ct. at 2485.

unique obligation toward the Indians, such legislative judgments will not be disturbed." 417 U.S. at 555, 94 S.Ct. at 2485.

■ Here, we conclude that exemption of treaty Indians from IPSFC regulations in order to allow them longer fishing periods is rationally related to fulfilling the United States' treaty obligations as mandated in *United States v. Washington*. Appellants experienced no denial of equal protection.

### C. IPSFC's "Emergency Order."

■ Article VI of the convention excludes "emergency orders required to carry out the provisions of the Convention" from the need for approval by the two countries. The Commission issued an "emergency order" on June 27, after the partial approval of its regulations by the United States, stating that its June 1 regulations applied to all citizens without exception. Decker argues that the United States has usurped the IPSFC's power in violation of the treaty by continuing to exempt treaty Indians from its regulations and subjecting them instead to regulations of the Department of the Interior.

This argument has no effect on appellants' convictions. Even if the IPSFC's June 27 pronouncement could properly be characterized as a valid emergency order,[16] its only effect would have been to apply the IPSFC regulations to all, including the appellants. Since they were fishing on the "extra day" allowed for Indians under the Interior Department system, they were still in violation of Commission regulations and, as such, were properly convicted under 16 U.S.C. § 776a.

### D. Lack of Canadian Approval.

■ Marriott contends that the IPSFC regulations are ineffective because they were approved only by the United States and not by Canada. The government responds that Canadian approval is unnecessary for regulations that apply only to United States convention waters.

The treaty is arguably ambiguous because it provides that, with exceptions not relevant here "[a]ll regulations made by the Commission shall be subject to approval of the Governments." 8 U.S.T. at 1060. Again, however, we may look to the practice of the parties as an aid to construction of the treaty. *Pigeon River Improvement Co. v. Charles W. Cox, Ltd.*, 291 U.S. at 158, 54 S.Ct. 361. *See also Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 35 (2d Cir. 1975).

Affidavits by a State Department official and by the chairman of the IPSFC state that the established practice has been for the Commission to promulgate separate regulations for fishing in United States and Canadian waters and then to request approval only by the government of the country to which they apply.

Neither the IPSFC nor the parties to the treaty have interpreted the convention to require approval of one country for regulations pertaining to fishing by the other. Lack of Canadian approval, therefore, does not make the regulations ineffective.

## IV.

## CONCLUSION

We find these cases justiciable, but conclude that, under this set of facts, the United States properly could approve the 1977 IPSFC regulations in part. The partial approval was not inconsistent with the objectives of the convention and did not deny appellants equal protection because there was a rational basis for the classifications drawn. The "emergency order" and lack of Canadian approval of regulations applying to United States convention waters do not affect appellants' convictions.

AFFIRMED.

---

16. The district court in *Purse Seine* held that the IPSFC's "so called 'emergency order' adopted by it on June 27, 1977, is of no force and effect because . . . the subject matter of that order, . . . the domestic allocation of the U.S. fish catch, is not a matter within the delegated authorities of the Commission." No. C77–471M, slip op. at 4 (W.D.Wash. July 8, 1977) (order denying motion for preliminary injunction).