Joseph SIMMONS, Jr., David Simmons, Clarence Tougaw and Viola Tougaw, and those similarly situated, Plaintiffs,

v.

Chief EAGLE SEELATSEE, individually and as Chairman of the Yakima Tribal Council, and the Yakima Tribal Council of the Confederated Bands and Tribes of the Yakima Nation, Defendants.

Civ. No. 2021.

United States District Court
E. D. Washington, S. D.

Aug. 26, 1965.

Frederick Paul, Seattle, Wash., for plaintiff.

James B. Hovis, Yakima, Wash., for defendant.

Before POPE, Circuit Judge, and JAMESON and POWELL, District Judges.

POPE, Circuit Judge.

The plaintiffs here brought this action by filing a complaint against the Yakima Tribal Council above named and the Chairman thereof. The complaint alleges that plaintiffs are the children and grandchildren of one Joseph Simmons, Sr., who is a member of the Yakima Indian Nation and an enrolled member of the tribe who died May 2, 1960, owning certain interests in Yakima Indian Allotments on the Yakima Indian Reservation in the State of Washington; that they have been denied any interest in the said property of Joseph Simmons, Sr., and denied the right to inherit the same notwithstanding the fact that under the laws of the State of Washington, they would be entitled to inherit his property;[1] and that this denial has been pursuant to the provisions of the Act of August 9, 1946, 60 Stat. 968 (25 U.S.C. § 607), § 7 of which provides: "After August 9, 1946, only enrolled members of the Yakima Tribes of one-fourth or more blood of such tribes shall take by inheritance or by will any interest in that part of the restricted or trust estate of a deceased member of such tribes which came to the decedent through his membership in such tribes or which consists of any interest in or the rents, issues, or profits from an allotment of land within the Yakima Reservation or within the area ceded by the treaty of June 9, 1855 (12 Stat. 951) * * *."

These allegations are amplified further by what we deem to be amendments of the complaint. During the pendency of the case and prior to the hearing on the several motions to dismiss, plaintiffs filed an affidavit setting forth verbatim certain orders made by the Department of Interior for the purpose of disclosing that the Secretary of the Interior, through his Examiner of Inheritance,[2] rejected plaintiffs' claim of heirship.[3]

These amendments further showed that this rejection of claim of heirship was based on the provisions of § 7, the section here under attack. On August 21, 1964, the Examiner advised plaintiffs' counsel as follows: "We have taken considerable testimony and have the family of the decedent established. However, under the Act of August 9, 1946, (60 Stat. 968; 25 USC 607, Section 7), of which you are no doubt fully aware, the relatives of Joseph Simmons, Sr., have been unable to qualify under the above Act to inherit Yakima Indian trust property."

We are therefore confronted with allegations of these facts: the Secretary of the Interior has denied plaintiffs' claim of heirship, and he has denied it on the basis of their inability to meet the requirement of "one-fourth or more blood" of the Yakima Tribes, as required by § 7.

The complaint further alleges that said § 7 is void and unconstitutional for two reasons: first, it is alleged that the Act is wanting in due process because it bears no reasonable relation to the guardianship the United States has over Indians; that it restricts the free choice of Yakima enrollees in prospective

---

1. 25 U.S.C. § 348 requires that trust patents shall provide that the United States will hold the lands "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located * * *."

2. The Secretary's function of determining heirship of deceased allottees of restricted lands is performed by "Examiners of Inheritance". See 25 C.F.R. 81.1 and "Federal Indian Law", (1958 Revision of Cohen), pp. 76, 77.

3. These orders, added as amendments to the complaint, disclosed that on December 11, 1964, the Examiner advised counsel for plaintiffs: "We have taken sufficient testimony showing the relatives of both parties to determine their heirs, if such relatives were eligible to inherit under § 7 of the Yakima Enrollment Act but we find no eligible relatives." On December 22, 1964, the Examiner advised plaintiffs "To date we have not been able to find any relatives of the above deceased [meaning the decedents referred to in the complaint] for whom a certificate of eligibility could be issued by the Yakima Tribal Council."

spouses and confiscates the Indians' property; and second, it is claimed that the quoted section is unconstitutional because it is "based on a criterion of race contrary to the provisions of the Fifth Amendment to the United States Constitution," citing Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884.[4]

The named defendants appeared by motion to dismiss for failure to state a claim upon which relief can be granted, and upon various other grounds including the assertion that the court was without jurisdiction over the subject matter of the action since the power of determining plaintiffs' rights to inherit was within the exclusive jurisdiction of the Secretary of the Interior; that there was no jurisdiction over the person of the defendants, who were not amenable to suit or to service of process; and that both the Secretary of the Interior and the United States are indispensable parties to the action and the United States moreover had not given its consent to a suit of this character.

The United States, acting through the Attorney General and at his direction, moved the court for leave to intervene and such leave was granted. The petition in intervention of the United States adopted the position of the defendants taken in their motion to dismiss and in effect joined in support of that motion and filed a memorandum of points and authorities in support of such motion.

Because the complaint challenged the constitutionality of the section of the Act above mentioned, a three-judge court was assembled. The case was argued and submitted upon the motion to dismiss made by the defendants and thus joined in by the United States.

We agree that as the complaint was filed there was an absence of an indispensable party, either the Secretary of the Interior, or the United States. But it must be noted that the United States has intervened here, and, as counsel advised us at the hearing, has done so for all purposes.

As we inquire whether on this record we can reach the merits of this case we are confronted with two statutory provisions. One is § 1 of the Act of August 15, 1894, c. 290, 28 Stat. 305 (25 U.S.C. § 345) set forth in the margin,[5] which provides in substance that a person who is in whole or in part of Indian blood or descent—who is entitled to an allotment or who claims to have been unlawfully denied or excluded from any allotment may litigate his rights and claims in the proper district court of the United States, naming the United States as party defendant.

The important question at this point arises from the second and later enactment of the Act of June 25, 1910, c. 431, § 1, 36 Stat. 855 (25 U.S.C. § 372). This section provides that when an Indian to whom an allotment has been made dies

4. "Classifications based solely on race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect." (p. 499, 74 S.Ct. p. 694)

5. "§ 345. Actions for allotments—All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty (and in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant); and the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him, * * *."

before the expiration of the trust period "the Secretary of the Interior, upon notice and hearing, under such rules as he may prescribe, shall ascertain the legal heirs of such decedent, and his decision thereon shall be final and conclusive."

■ As was noted in Arenas v. United States, 9 Cir., 197 F.2d 418, 420, "the enactment of June 25, 1910 operated to withdraw from the courts jurisdiction to ascertain the heirs of the dead allottees holding under trust patents", citing Hallowell v. Commons, 239 U.S. 506, 36 S.Ct. 202, 60 L.Ed. 409, United States v. Bowling, 256 U.S. 484, 487, 41 S.Ct. 561, 65 L.Ed. 1054, and other cases.

If we apply that rule literally, if we say, using the words of the last mentioned Act that the decision here of the Secretary shall be "final and conclusive", and at the same time recognize that there is here a substantial question of constitutional law, then we would be holding that the Secretary could act in an unconstitutional manner, and that his action could not be questioned;—that he had the power finally to determine a constitutional question.

Such a construction of this "final and conclusive" provision can neither be thought to be within the intent of Congress nor can it be consistent with due process. A provision requiring such a construction would be wanting in due process. Such is the holding of Ng Fung Ho v. White, 259 U.S. 276, 284–285, 42 S.Ct. 492, 495, 66 L.Ed. 938.[6] It has been held that the action of the Secretary under this section of the Act of June 25, 1910, (25 U.S.C. § 372) is subject to review in a court of equity in a direct proceeding "to inquire into and correct mistakes, injustice and wrong in both judicial and executive action."

Hanson v. Hoffman, 10 Cir., 113 F.2d 780, 791. As far back as 1871 the Supreme Court, in Johnson v. Towsley, 13 Wall. 72, 20 L.Ed. 485, had before it the question of the conclusiveness of the action of the Commissioner of the Land Office where the Act involved provided that his decision in a land contest "shall be final." The Court said (pp. 83–84): "That the action of the land office in issuing a patent for any of the public land, subject to sale by pre-emption or otherwise, is conclusive of the legal title, must be admitted under the principle above stated, and in all courts, and in all forms of judicial proceedings, where this title must control, either by reason of the limited powers of the court, or the essential character of the proceeding, no inquiry can be permitted into the circumstances under which it was obtained. On the other hand there has always existed in the courts of equity the power in certain classes of cases to inquire into and correct mistakes, injustice, and wrong in both judicial and executive action, however solemn the form which the result of that action may assume, when it invades private rights; and by virtue of this power the final judgments of courts of law have been annulled or modified, and patents and other important instruments issuing from the crown, or other executive branch of the government, have been corrected or declared void, or other relief granted."

■ We hold that the rule of Ng Fung Ho, supra, means that if on examination, we find that there is present here a substantial question as to the constitutionality of § 7, on which the Department acted, we must examine into and review the Department's action. And the Act of August 15, 1894, supra, (25 U.S.C. § 345) furnishes the proce-

6. "To deport one who so claims to be a citizen obviously deprives him of liberty, as was pointed out in Chin Yow v. United States, 208 U.S. 8, 13, 28 Sup.Ct. 201, 52 L.Ed. 369. It may result also in loss of both property and life, or of all that makes life worth living. Against the danger of such deprivation without the sanction afforded by judicial proceedings, the Fifth Amendment affords protection in its guarantee of due process of law. The difference in security of judicial over administrative action has been adverted to by this court."

dure for such a court test,[7] and contains the consent of the United States to be sued. The United States has entered this suit for all purposes. In these circumstances plaintiffs would come within the literal terms of § 345, and § 372 cannot, consistent with due process, prohibit court examination of the constitutional question presented, or prohibit plaintiffs from proceeding under § 345.

◼ We come then to the merits of plaintiffs' complaint, and inquire as to the validity of § 7 (25 U.S.C. § 607). It is well settled that Congress has plenary control over Indian tribal relations and property and that this power continues after the Indians are made citizens. Williams v. Johnson, 239 U.S. 414, 420, 36 S.Ct. 150, 60 L.Ed. 358. "After 1871, Congress turned from regulating Indian affairs by treaties to regulation by agreement and legislation. The plenary character of this legislative power over various phases of Indian affairs has been recognized on many occasions." Board of County Com'rs of Creek County v. Seber, 318 U.S. 705, 716, 63 S.Ct. 920, 926, 87 L.Ed. 1094.[8]

As stated in Tiger v. Western Investment Co., 221 U.S. 286, 310, 31 S.Ct. 578, 584, 55 L.Ed. 738, "We must remember in considering this subject that the Congress of the United States has undertaken from the earliest history of the government to deal with the Indians as dependent people, and to legislate concerning their property with a view to their protection as such." And as there noted (p. 311, 31 S.Ct. p. 584) " 'Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government. Lone Wolf v. Hitchcock, 187 U.S. [553] 565 [23 S.Ct. 216, 47 L.Ed. 299].' "[9]

◼ This plenary power of Congress to legislate with respect to Indian rights exists regardless of whether the Indians are citizens or otherwise. Brader v. James, 246 U.S. 88, 96, 38 S.Ct. 285, 62 L.Ed. 591. And it was early held that included in this plenary power of Congress was the power to regulate and determine tribal membership. In short, Congress, or its delegated agents, had full power to define and describe those persons who should be treated and regarded as members of an Indian tribe and entitled to enrollment therein. Stephens v. Cherokee Nation, 174 U.S. 445, 488, 19 S.Ct. 722, 738, 43 L.Ed. 1041.[10]

7. § 10 of the Administrative Procedure Act (5 U.S.C. § 1009): "The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute * * *." It may well be that after the United States intervened plaintiffs' complaint should have been further amended so as specifically to ask judgment against the United States. On this motion to dismiss we must disregard any such amendable defect. Conley v. Gibson, 335 U.S. 411, 78 S.Ct. 99, 2 L.Ed.2d 80.

8. See also the cases cited by the Court in a footnote appended to the quoted statement.

9. That traditionally the Supreme Court has declined to question congressional or administrative action with respect to the Indian membership and Indian property was recently recognized in Baker v. Carr, 369 U.S. 186 at p. 215, 82 S.Ct. 691,

7 L.Ed.2d 663. See also dissenting opinion, p. 282, 82 S.Ct. p. 746.

10. "We repeat that, in view of the paramount authority of congress over the Indian tribes, and of the duties imposed on the government by their condition of dependency, we cannot say that congress could not empower the Dawes commission to determine, in the manner provided, who were entitled to citizenship in each of the tribes, and make out correct rolls of such citizens, an essential preliminary to effective action in promotion of the best interests of the tribes." See in accord Cherokee Nation v. Hitchcock, 187 U.S. 294, 306, 307, 23 S.Ct. 115, 47 L.Ed. 183.

In referring to the Stephens case, supra, "Federal Indian Law" (1958 Revision of Cohen, supra) (p. 43) states: "Thus, the United States may assume full control over Indian tribes and determine membership in the tribe for the purpose of adjusting rights in tribal property."

It appears plain that in the Act of August 9, 1946, Congress was doing no more than defining what constituted membership in the Yakima Tribes.[11] It is true that in doing so it specified a minimum quantum of Yakima Indian blood, but it seems obvious that whenever Congress deals with Indians and defines what constitutes Indians or members of Indian tribes, it must necessarily do so by reference to Indian blood. What was done here was in line with what Congress had previously done. The cases of Tiger v. Western Investment Co., supra, United States v. First National Bank of Detroit, 234 U.S. 245, 260, 34 S.Ct. 846, 58 L.Ed. 1298, and United States v. Ferguson, 247 U.S. 175, 38 S.Ct. 434, 62 L.Ed. 1052, furnish illustrations of the fact that Congress in legislation has not hesitated to place full-blood Indians in one class and all others in another, giving one class more rights than the other.

The Act which authorizes the Secretary of the Interior generally to make up membership rolls of any Indian tribe directs that such rolls shall contain the ages and "quantum of Indian blood" of those placed on the rolls. Act of June 30, 1919, 41 Stat. 9, (25 U.S.C. § 163). The Act of May 25, 1918, 40 Stat. 564, (25 U.S.C. § 297), provided that appropriations made to educate Indian children should not be used to educate children of "less than one-fourth Indian blood" where there are adequate free school facilities in the State. Under the Act of May 7, 1948, 62 Stat. 211, (25 U.S.C. § 482), certain loans available for tribes and individual Indians are prohibited to be made to Indians "of less than one-quarter Indian blood". The Act of August 27, 1954, 68 Stat. 868, (25 U.S.C. § 677aa) relating to the Ute Indians, divides all such Indians into "full-blood" meaning those having an excess of one-half Indian blood, and "mixed-blood", and provides for separate and distinct rights and treatments of the two classes of Indians.[12]

It is plain the Congress, on numerous occasions, has deemed it expedient, and within its powers, to classify Indians according to their percentages of Indian blood. Indeed, if legislation is to deal with Indians at all, the very reference to them implies the use of "a criterion of race". Indians can only be defined by their race.[13]

11. The enactment of the Act of August 9, 1946, did not affect any vested property rights of plaintiffs. Their ancestor did not die until May 2, 1960. Up to that time plaintiffs had a mere anticipation of heirship. A statute fixing heirs may be altered at any time. This plaintiffs admit.

12. § 677d of Title 25 contains the following statement: "Effective on the date of publication of final rolls as provided in § 677g of this title the tribe shall thereafter consist of full-blood members."

13. A few of the instances in which special regulations have been enacted which apply exclusively to Indians as such are as follows:

Limitation on contracts without the Secretary's approval, 25 U.S.C. §§ 81, 82, 82a, 84.

Limitation on application of tribal funds, 25 U.S.C. § 122.

Limitation of rights of white men marrying Indian women, 25 U.S.C. § 181.

Limitation on persons permitted to trade with Indians, 25 U.S.C. §§ 261, 262, 263, 264.

Limitation on sending Indian children to school out of state, 25 U.S.C. § 286.

Placing Indian pupils in Indian Reform School, 25 U.S.C. § 302.

Restrictions on sale or lease of lands, 25 U.S.C. §§ 348, 391, 393.

A logical application of plaintiffs' position respecting the unconstitutionality of a "criterion of race" would cast doubt on all such legislation. Defendants have made this point as follows: "Let us assume that every statute which has race as the basis of its classification violates the Fifth Amendment as alleged by the Plaintiffs. If this be so, then every statute relating to Indians, qua Indians, is unconstitutional. The trust established over 'Indian' lands is unconstitutional. The allotment to Lucy Simmons, and the authorization of the inheritance of Joseph Simmons, Sr., are each based on the determination that the individual in ques-

We hold that there was a rational basis for the classification provided in § 7, supra. Necessarily continued intermarriage with white persons would ultimately produce persons who were in no true sense Indians. At some reasonable point a line must be drawn between Indians and non-Indians, between those properly to be regarded as continuing members of the tribe, and those who are not. Their case has no resemblance to Bolling v. Sharpe, supra, where the segregation of pupils, by race, in public schools was held a violation of the Fifth Amendment.

We hold that the complaint here fails to state a claim, that it cannot be amended to state a claim since plaintiffs are obviously without rights in the premises, and the complaint, and the action are dismissed with prejudice.

Judgment to that effect will be entered.

tion is an Indian. The plaintiffs say this is unconstitutional—so be it. By

what right do plaintiffs claim any right to this land?"