Josiah L. HOOHULI, G. Analika, N. Victor, Linda Dela Cruz, Apolonia K. Day, Daniel Dancil, Wilma Likolehua Kamakana Grambusch, Judith K. Napoleon, Danette K. Rayford, Johnny L. Rayford, Solomon P. Kahoohalahala, Bud Shasteen, and Tax Payers Union, Plaintiffs,

v.

George R. ARIYOSHI, Governor; Jensen S. L. Hee, Director of Finance; Hideo Murakami, Comptroller; Adelaide "Frenchy" DeSoto, Joseph G. Kealoha, Jr., Rodney K. Burgess III, Thomas K. Kaulukukui, Sr., Peter K. Apo, Roy L. Benham, Moses K. Keale, Sr., Walter L. Ritte, Jr. and A. Leiomalama Solomon, Trustees; and Edwin P. Auld, Administrator, Office of Hawaiian Affairs, State of Hawaii, Defendants.

Civ. No. 81–0182.

United States District Court,
D. Hawaii.

March 25, 1986.

Mitsuo Uyehara, Honolulu, Hawaii, for plaintiffs.

Charlotte E. Libman, Deputy Atty. Gen., Corinne Watanabe, Atty. Gen., State of Hawaii, Honolulu, Hawaii, for defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AS AMENDED

SAMUEL P. KING, Senior District Judge.

In 1978, the people of Hawaii voted to amend their state constitution to create the Office of Hawaiian Affairs to benefit "native Hawaiians" and "Hawaiians." As will be discussed, a "native Hawaiian" is defined as a person with at least fifty percent native blood, while a "Hawaiian" is defined as any descendant of the native peoples of the Hawaiian Islands.[1] Plaintiffs have brought a taxpayers' action challenging the appropriation of state funds to the Office of Hawaiian Affairs, and the use of these funds by the Office, for the benefit of "Hawaiians." Plaintiffs assert that the legislature's definition of "Hawaiian" is unconstitutional because there is no reference to blood quantum, and that the appropriation of taxpayer monies to be expended for the benefit of "Hawaiians" deprives them of equal protection, as guaranteed by the Fourteenth Amendment and by title 42, section 1983 of the United States Code.

Plaintiffs have repeatedly stressed that they do not challenge the constitutionality of the Office of Hawaiian Affairs, per se. Nor do they challenge expenditures to benefit "native Hawaiians," which expenditures they find "clearly constitutional."

Thus, plaintiffs have explicitly agreed with the defendants that preferences to native peoples are constitutional. Plaintiffs do not "challenge the power of the State of Hawaii to define and describe those persons who should be regarded as the aboriginal class of peoples of Hawaii."[2] Rather, "the present action challenges the line the State has drawn between those who are of aboriginal class and those who are not...."[3]

## I

## BACKGROUND

Some background is essential for understanding the Office of Hawaiian Affairs and plaintiffs' specific objections set forth in this suit.

### A. Statutory Background

#### 1. Hawaiian Homes Commission Act

In 1920, Congress passed the Hawaiian Homes Commission Act (HHCA), which set aside certain "available lands" for the benefit of "native Hawaiians." A "native Hawaiian" was defined as "any descendant of not less than one-half part blood of the races inhabiting the Hawaiian Islands previous to 1778."[4]

When Hawaii became a state in 1959, it made a compact with the United States to adopt the HHCA as a part of the state constitution and to apply all proceeds from the "available lands" only to carrying out the homelands program.[5]

#### 2. Trust Lands under the Admission Act

Under section 5(b) of the Admission Act, the United States transferred title to all public lands, including the "available lands" defined in the HHCA, to the state. Under section 5(f), the state is required to

---

1. Hawaii Rev.Stat. § 10–2(4)–(5) (Supp.1984).

2. Plaintiffs' Objections to Defendants' Motion to Dismiss, Dec. 2, 1985, at 11.

3. *Id.*

4. 48 U.S.C.A. § 692(a)(7) (1959).

5. The Admission Act, Pub.L. No. 86–3, 73 Stat. 4, § 4 (1959); Hawaii Const. art. XII, § 3 (Supp. 1984).

hold these section 5(b) public lands and their proceeds in trust for various public purposes including the support of public schools, and the betterment of the condition of "native Hawaiians" as defined in the HHCA.[6]

### 3. Constitutional Amendments Providing for OHA

In 1978, the people of the State of Hawaii voted to amend the state constitution to add several significant provisions. Delegates to the Constitutional Convention had been concerned that none of the lands trust proceeds were being used specifically to benefit "native Hawaiians," since the state's practice had been to channel the money directly to the Department of Education. However, they were also concerned about the welfare of all people of Hawaiian ancestry and about the preservation of aboriginal culture. Thus the Convention proposed, and the voters approved,

the creation of the Office of Hawaiian Affairs (OHA) and a trust to benefit "native Hawaiians and Hawaiians."[7]

The office and its programs are funded primarily by legislative appropriations which are held in trust.[8] The office manages and administers the trust for, and formulates policies relating to, "native Hawaiians and Hawaiians." Thus taxpayers' money is being spent to better the condition of both "native Hawaiians" and "Hawaiians." In addition, a pro rata portion of a lands trust created under Article XII, section 4 is transferred to a separate trust which OHA manages for the exclusive benefit of "native Hawaiians."[9]

Originally, section 7 of the proposed constitutional amendments provided definitions of "Hawaiian" and "native Hawaiian." The term "native Hawaiian" was defined as "any descendant of not less than one-half part of the blood of the races

---

**6.** Pub.L. No. 86–3, 73 Stat. 4, § 5(b), (f) (1959). Section 5(f) provides:

> The lands granted to the State of Hawaii by subsection (b) of this section ... together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States....

**7.** Hawaii Const. art. XII, §§ 5–6 (Supp.1984). The constitutional amendments provide:

> Section 5. There is hereby established an Office of Hawaiian Affairs. The Office of Hawaiian Affairs shall hold title to all the real and personal property now or hereafter set aside or conveyed to it which shall be held in trust for native Hawaiians and Hawaiians. There shall be a board of trustees for the Office of Hawaiian Affairs elected by qualified voters who are Hawaiians, as provided by

law. The board members shall be Hawaiians....

> Section 6. The board of trustees of the Office of Hawaiian Affairs shall exercise power as provided by law: to manage and administer the proceeds from the sale or other disposition of the lands, natural resources, minerals and income derived from whatever sources for native Hawaiians and Hawaiians, including all income and proceeds from that pro rata portion of the trust referred to in section 4 of this article for native Hawaiians; to formulate policy relating to affairs of native Hawaiians and Hawaiians; and to exercise control over real and personal property set aside by state, federal or private sources and transferred to the board for native Hawaiians and Hawaiians....

> For an informative discussion of the background of the Office of Hawaiian Affairs, see Van Dyke, *The Constitutionality of the Office of Hawaiian Affairs*, 7 U.Hawaii L.Rev. 63 (1985).

**8.** The Legislature appropriated $1,087,467 to OHA for fiscal years 1983 to 1985 and $1,129,-863 for fiscal years 1985 to 1987.

> The trust may also be funded by additional sources such as gifts or congressional appropriations. For example, OHA has received money for certain programs from the federal government under the Native American Programs Act of 1974, 42 U.S.C. § 2991 (1982).

**9.** *See* Hawaii Const. art. XII, §§ 4, 6 (Supp. 1984); Hawaii Rev.Stat. §§ 10–3, 10–13.5 (Supp. 1984).

inhabiting the Hawaiian Islands previous to 1778 as defined by the Hawaiian Homes Commission Act, 1920, as amended or may be amended." "Hawaiian" was defined without reference to blood quantum as "any descendant of the races inhabiting the Hawaiian Islands, previous to 1778." However, in *Kahalekai v. Doi*,[10] the Hawaii Supreme Court held that this definitional section was not properly presented to the public for its consideration. Thus, because of a technicality in the ratification process, this definitional section was invalidated.

### 4. *Implementing Legislation*

Chapter 10 of the Hawaii Revised Statutes provides implementing legislation for OHA. In its Declaration of Purpose, the statute provides:

> The people of the State of Hawaii and the United States of America as set forth and approved in the Admission Act, established a public trust which includes among other responsibilities the betterment of conditions for native Hawaiians. The people of the State of Hawaii reaffirmed their solemn trust obligation and responsibility to native Hawaiians and furthermore declared in the state constitution that there be an office of Hawaiian affairs to address the needs of the aboriginal class of people of Hawaii.[11]

The purposes of the office are, among others, to better the condition of "native Hawaiians" and "Hawaiians;" to coordinate state programs for "Hawaiians" and "native Hawaiians;" and to assess the impact of state policies and practices on "Hawaiians" and "native Hawaiians."[12] The statute carries through the distinction set up by the Hawaii Constitution between "native Hawaiians" and "Hawaiians."

"Native Hawaiians" are defined as:

any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii.[13]

"Hawaiian" is defined as:

any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii."[14]

These legislative definitions are in basic conformity with the invalidated constitutional amendments.

### B. *Procedural Background and Standing*

Plaintiffs in this action originally included a taxpayers advocacy organization, known as the Tax Payers Union, and eleven taxpayers who are residents of Hawaii. Nine of the taxpayers are "native Hawaiians." Plaintiffs requested an injunction and an accounting and reimbursement for money improperly allocated to "Hawaiians."

This court dismissed the plaintiffs' action on numerous jurisdictional grounds. The dismissal followed from this court's opinion that the suit was essentially against the State of Hawaii, which is not a person within the meaning of 42 U.S.C. § 1983; that the action was barred by the Eleventh Amendment; and that even if the suit were not so barred, the defendants would be protected by the doctrine of qualified immunity.[15]

---

**10.** 60 Hawaii 324, 342, 590 P.2d 543, 555 (1979).

**11.** Hawaii Rev.Stat. § 10–1(a) (Supp.1984).

**12.** *Id.* § 10–3.

**13.** *Id.* § 10–2(4).

**14.** *Id.* § 10–2(5).

**15.** *Hoohuli v. Ariyoshi*, Civil No. 81–0182 (D. Hawaii Sept. 25, 1981) (order granting motion to dismiss).

On appeal, the Ninth Circuit Court of Appeals held that plaintiffs could not seek monetary relief or an accounting, but that neither the Eleventh Amendment nor principles of qualified immunity barred their request for injunctive relief.[16]

The circuit court of appeals also addressed whether the taxpayers had standing to bring the action and determined that although recent Supreme Court cases have limited federal taxpayer standing, these cases do not affect standing of state taxpayers challenging state statutes.[17] The court noted that state taxpayers can achieve standing in a broader range of circumstances than federal taxpayers, and that here, some of the plaintiffs had satisfied the requirements for standing. Specifically, the court found that:

> [e]ach of the individual plaintiffs have set forth his or her status as a taxpayer. The challenge is to the "appropriating, transferring, and spending ... of taxpayers' money from the General Fund of the State Treasury...." Plaintiffs complain that, "[b]y creating the class identified as 'Hawaiians' in the office of Hawaiian Affairs, in addition to the class 'Native Hawaiians,' taxpayers have been burdened with the necessity to provide more taxes to support said second class." The pleadings set forth with specificity amounts of money appropriated and spent for allegedly unlawful purposes. This case fits the description of a "good-

faith pocketbook action" set forth in *Doremus [v. Board of Education]*, 342 U.S. [429] at 434, 72 S.Ct. [394] at 397 [96 L.Ed. 475 (1952)]. We therefore hold that at least some of the individual plaintiffs have standing as taxpayers.[18]

The court held that the Tax Payers Union did not have standing because it is not a taxpayer. In addition, the court reserved judgment as to whether the "native Hawaiian" taxpayers had standing. Since they are beneficiaries of the programs they seek to enjoin, the court reasoned that the benefits they receive from the program could serve to negate any pocketbook injury they receive as taxpayers and thus destroy their standing. The Ninth Circuit Court of Appeals instructed the lower court to determine, on remand, whether the "native Hawaiian" plaintiffs have standing.

■ This court, however, finds it unnecessary to determine the standing of the "native Hawaiian" plaintiffs. The appellate decision makes it clear that there are two plaintiffs who presently have standing. These plaintiffs are residents and taxpayers of Hawaii and are neither "Hawaiians" nor "native Hawaiians." For the purposes of this action, as long as there is at least one plaintiff with standing, this court need not address whether there are additional plaintiffs who might also have standing to assert the same claims presented for review.[19]

---

**16.** *Hoohuli v. Ariyoshi*, 741 F.2d 1169, 1181 (9th Cir.1984).

**17.** 741 F.2d at 1177–81.

**18.** *Id.* at 1180.

**19.** *E.g., Secretary of Interior v. California*, 464 U.S. 312, 319 n. 3, 104 S.Ct. 656, 660 n. 3, 78 L.Ed.2d 496 (1984); *Carey v. Population Services International*, 431 U.S. 678, 682, 97 S.Ct. 2010, 2014, 52 L.Ed.2d 675 (1977); *Legal Aid Society v. Brennan*, 608 F.2d 1319, 1334 (9th Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *National Wildlife Federation v. Adams*, 629 F.2d 587, 594 n. 11 (9th Cir.1980).

The Ninth Circuit Court of Appeals further stated that they were uncertain, on the basis of the complaint, whether the "native Hawaiians" were alleging injury in their capacity as natives,

separate and apart from their alleged injury as taxpayers. The court suggested that plaintiffs amend their complaint to allege injury as "native Hawaiians," supplementing the record as necessary, and that this court should then rule on their standing in that capacity. This court, however, does not have to rule on the standing of the "native Hawaiians" unless, as plaintiffs, their claims would materially affect this court's consideration of the merits. For example, only if they claimed different relief or different substantive theories would their status as additional plaintiffs in this suit be important. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72 n. 16, 98 S.Ct. 2620, 2629 n. 16, 57 L.Ed.2d 595 (1978); *National Wildlife Federation v. Adams*, 629 F.2d 587, 594 n. 11 (9th Cir.1980); C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3531.15, at 101–02 (2d ed.1984).

## II

### THE DEFINITION OF "HAWAIIAN" IS CONSTITUTIONAL

#### A. *Standard of Review*

In evaluating legislation under an equal protection challenge, courts generally apply one of two standards. Normally, a court will employ a "rational basis" standard; that is, in the area of social and economic legislation, a law will be upheld if it is "rationally related to furthering a legitimate state interest."[20] Where legislation is challenged as impermissibly classifying people on the basis of race or national origin, however, a court will usually employ a "strict scrutiny" standard. Under this standard, "in order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary ... to the accomplishment' of its purpose or the safeguarding of its interest."[21]

■ Plaintiffs urge this court to apply the "strict scrutiny" standard simply because the OHA legislation uses a race-

---

Plaintiffs amended their complaint to allege: [t]hat Native Hawaiian plaintiffs have been injured as individuals and as members of the class Native Hawaiians by diversion of tax monies to the impermissable [sic] class identified as "Hawaiians". By so including the impermissable [sic] class, the class of beneficiaries has been increased and therefore the per capita benefits have been decreased.

Plaintiffs misunderstand the nature of the legislative appropriations at issue. Plaintiffs have no right to any per capita benefits. The legislature appropriates money to OHA for programs, grants and other sponsored activities. This money is not distributed to the individual beneficiaries; nor is it a fixed amount based on the number of "native Hawaiians" living in Hawaii. If this court found the term "Hawaiian" unconstitutional and therefore that legislative appropriations for "Hawaiians" is unconstitutional, the legislature is not bound to fund OHA the same amount of money to be used solely to benefit "native Hawaiians." In all likelihood, the legislature would decrease the appropriation. Plaintiffs have no vested right either to receive money themselves or to have a particular amount of money appropriated to OHA.

Although it is unclear from the record, plaintiffs could be attempting to distinguish "native Hawaiians" from the plaintiff taxpayers on one additional ground. In their original complaint, plaintiffs sought to enjoin any action of the defendants "which requires the use of tax payers moneys ... to diminish, imperil, or take away the vested interests of native Hawaiians in the ... Section 5(f) lands trusts of the Admission Act." Under a generous reading, the plaintiffs may be asserting that OHA is siphoning funds from the lands trust that should rightfully go to "native Hawaiians" only. If this were the case, the "native Hawaiian" plaintiffs might be able to allege an injury that is separate from their taxpayers' claim.

As has been discussed, the Constitutional Amendments and implementing legislation for OHA separates the revenue from the lands trust from the legislative appropriations. The pro rata portion of the lands trust that is designated

for "native Hawaiians" is separately held by OHA and is administered solely for programs to benefit "native Hawaiians." *See* Opinion of the Hawaii Attorney General, 83-2 (1983); Affidavit of Martin O. Wilson, Administrative Services Officer, Office of Hawaiian Affairs, attached to Defendants' Reply Memorandum, Dec. 6, 1985.

Plaintiffs appear to object to a legislative requirement that section 5(f) funds be used to match certain legislative appropriations for the administration of OHA. To the extent that these matching funds are used to administer any programs for "Hawaiians," this use might diminish or limit the benefits of "native Hawaiians" from the pro rata share in violation of Hawaii Const. art. XII, § 4 and art. XVI, § 7. While this may be a valid objection, the issue is not presently before the court. The plaintiffs purport to make this objection on equal protection grounds and stress that they are not bringing an action to enforce the Admissions Act lands trust. However, this objection presents no constitutional equal protection issue. Further, it is irrelevant as to whether the definition of "Hawaiian" is constitutional or not, which plaintiffs have stressed throughout the record and repeatedly during oral argument, is the *sole* issue before the court.

In summary, the "native Hawaiian" plaintiffs do not claim any cognizable injury from legislative appropriations to OHA separate or apart from their alleged injury as taxpayers.

---

20. *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed. 520 (1976); *see also, e.g., United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 174–79, 101 S.Ct. 453, 459–62, 66 L.Ed.2d 368 (1980); *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979).

21. *In re Griffiths,* 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2854–55, 37 L.Ed.2d 910 (1973) (footnotes omitted), quoting from *McLaughlin v. Florida,* 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964).

based classification. The Office of Hawaiian Affairs does, in fact, give preference to both "Hawaiians" and "native Hawaiians" based solely on ancestral lineage, and the definitions specifically refer to such terms as "races" and "aboriginal peoples." However, plaintiffs are not contesting the ability of the legislature to give preferences to some group of aboriginal peoples.[22] Instead, plaintiffs are only arguing that the line the legislature has drawn is incorrect, because the legislature has chosen to *expand* the class of beneficiaries to all members of the race-based class of aboriginal descendants. The court is not asked to pass on the constitutionality of the OHA program or of the racial preference itself. The court's only task is to examine the parameters of the beneficiary class. This is a traditional "rational basis" inquiry as applied to social welfare legislation.[23]

This court will uphold the definition of "Hawaiian" if there is some "reasonable basis" to support it, and as long as the legislature did not achieve its purpose in a "patently arbitrary or irrational way."[24] Where there are plausible reasons for the legislature's classification, "the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration."[25] As the Supreme Court has noted, "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations...."[26] Further, laws providing for governmental payment of monetary benefits bear a "strong presumption of constitutionality. 'So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and needy, are not subject to a constitutional straitjacket.' "[27] Finally, of course, the burden of proof is on the plaintiffs to show the irrationality of the legislative classification.[28]

**22.** For example, if plaintiffs were Caucasions challenging appropriations to both "Hawaiians" and "native Hawaiians," "strict scrutiny" might be the appropriate standard.

**23.** Plaintiffs expended considerable energy arguing that the standard should be "strict scrutiny" for the term "Hawaiian" but merely "rational basis" for the term "native Hawaiian." First, they argued that the legislature specifically recognized that the "Hawaiian" classification was a racial classification and therefore *per se* impermissible. The legislative history on which they relied is as follows:

Your Committee upon further consideration has made the following amendments to H.B. No. 890, H.D. 1, S.D. 3:

(1) Section 2, Definitions. The definitions of "native Hawaiian" and "Hawaiian" are changed to substitute "peoples" for "races." Your Committee wishes to stress that this change is non-substantive, and that "peoples" does mean "races."

Conference Committee Report No. 77, Senate Journal, Session Laws of Hawaii 1979, at 998.

The mere mention of the term "race" does not automatically invoke the "strict scrutiny" standard or render the term "Hawaiian" unconstitutional, particularly where, as here, plaintiffs are not challenging the legislature's power to grant preferences to native peoples generally.

Plaintiffs further asserted that although the definition of "native Hawaiian" also used the term "races," it was *not* subject to strict scrutiny because it was in fact based on aboriginal lineage and not race. This court finds that if there is a distinction, it is without a difference.

Finally, plaintiffs argued that the term "native Hawaiian" was constitutional because it was originally defined by Congress in the Hawaiian Homes Commission Act, whereas the term "Hawaiian" was defined by the state legislature and thus somehow more likely to be unconstitutional. This argument is wholly without merit. Since the time of *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), it has been the province of the courts to pass on the validity of congressional enactments, which are equally susceptible to constitutional infirmity as are state enactments.

In short, this court finds that, for the purposes of this equal protection analysis, there is no constitutional distinction between "native Hawaiians" and "Hawaiians."

**24.** *United States Railroad Retirement Board,* 449 U.S. at 177, 101 S.Ct. at 460.

**25.** *Id.* at 179, 101 S.Ct. at 461.

**26.** *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

**27.** *Mathews v. DeCastro,* 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976), quoting from *Jefferson v. Hackney,* 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972).

**28.** *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 723, 66 L.Ed.2d 659 (1981).

### B. *The Legislature's Definition of "Hawaiian" is Reasonable and Furthers a Legitimate Purpose*

■ At the outset, it must be noted that concurrent with the power to pass social and economic welfare legislation, the legislature has the power to define the recipients of the state's largesse. In this case, the Hawaii legislature was *required* to define *both* the terms "native Hawaiian" and "Hawaiian," because the constitutional amendments ratified by the people of the state named both "native Hawaiians" and "Hawaiians" as beneficiaries of the OHA program.[29]

Defendants suggest that in the alternative, if this court does not select a rational basis standard, it should use the standard of review that is employed in Indian cases involving equal protection challenges. That is, the legislative judgment will not be disturbed "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward Indians." *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974) (upholding Bureau of Indian Affairs hiring preferences against challenge by non-Indians); *Delaware Tribal Business Commission v. Weeks,* 430 U.S. 73, 85, 97 S.Ct. 911, 919, 51 L.Ed.2d 173 (1977) (upholding congressional distribution of funds to one class of Delaware Indians against challenge by another group of Delawares legislatively excluded from the distribution).

In *Ahuna v. Department of Hawaiian Home Lands,* 64 Hawaii 327, 640 P.2d 1161 (1982), the Hawaii Supreme Court assessed the trust responsibilities that the Hawaiian Homes Commission owes to "native Hawaiians." The court specifically relied on federal Indian law principles regarding lands set aside by Congress in trust for the benefit of native Americans. The court reasoned that "[e]ssentially, we are dealing with relationships between the government and aboriginal people. Reason thus dictates that we draw the analogy between native Hawaiian homesteaders and other native Americans." 64 Hawaii at 339, 640 P.2d at 1169. *See also* Van Dyke, *supra* note 7, at 69–92, and Blondin, *A Case for Reparations for Native Hawaiians,* 16 Hawaii B.J. 13 (1981), analogizing aboriginal Hawaiians to other native Americans.

This court finds it unnecessary to determine whether the body of law that has been applied to other groups of native Americans is also generally applicable to aboriginal Hawaiians. As discussed above, plaintiffs do not challenge the legislature's ability to give preferences to native peoples. They merely argue that the leg-

**[4]** The starting point of this court's "rational basis" inquiry is a finding of a legitimate state purpose. The OHA legislation specifies that its purposes are the "betterment of conditions for native Hawaiians" and "to address the needs of the aboriginal class of people of Hawaii."[30] These are certainly commendable and valid aims and are well within the province of the state's police power.

■ Plaintiffs specifically object to the definition of "Hawaiian."[31] The court concludes that this definition has a rational basis and reasonably furthers the declared purpose of OHA to "address the needs of

islature is giving preference to too many people. Since we have held that the correct standard of review is "rational basis," we need not decide whether the *Morton v. Mancari* standard could also apply.

**29.** The plaintiffs seem to overlook this fact in arguing that OHA cannot constitutionally benefit "Hawaiians." They urge the court simply to prune the definition of "Hawaiian" from the legislation, leaving the definition of "native Hawaiian." Plaintiffs want an OHA elected by, governed by, and benefitting exclusively "native Hawaiians." However, this is not the agency that was envisioned by the people when they ratified the Article XII amendments for the benefit of both "native Hawaiians" and "Hawaiians."

**30.** Hawaii Rev.Stat. § 10–1(a) (Supp.1984).

**31.** As for the definition of "native Hawaiian," which is essentially the same as under the HHCA, this court notes that it is not only reasonable but is mandated by the relationship between OHA and the Admissions Act lands trust. Section 5(f) of the Admissions Act, which establishes the lands trust for native Hawaiians, defines "native Hawaiian" by referring to the definition in the HHCA. One of the specific purposes of OHA is to administer the pro rata share of the lands trust that has been designated exclusively for the benefit of "native Hawaiians." Thus, to draw any funds from the lands trust, the legislature must act consistently with the trust by retaining the same definition of "native Hawaiian" and then by actually using the money only for "native Hawaiians." This is further emphasized by art. XVI § 7, which stresses that the state may not pass legislation to diminish or limit the benefits of "native Hawaiians" under the Admissions Act trust provisions.

the aboriginal class of people in Hawaii."[32] The legislative reasoning behind the definition is clearly documented in committee reports relating to OHA and in Constitutional Convention Committee reports cited by the legislature.[33] First, the legislature noted that, except for minor changes, the definition was taken verbatim from the proposed constitutional amendment, article XII, section 7, that was found invalidly ratified in *Kahalekai v. Doi*. Further, the legislature hoped that by addressing the needs of all people of Hawaiian ancestry, OHA would "bring to eventual reality the equal participation of Hawaiians in the ultimate homogeneous and perfectly equal society that we seek to achieve for all posterity."[34] There was evidence that showed that the rationale for defining "native Hawaiian" in the HHCA in 1920 had become outmoded, and that many more Hawaiians other than half-blood Hawaiians need remedial legislation to address problems of crime, inadequate housing, education, and welfare. In addition, defining "Hawaiian" to include all people of aboriginal blood could help alleviate divisiveness in the Hawaiian community resulting from blood quantum restrictions. Finally, the legislature drew support from numerous recent congressional acts, such as the Native American Programs Act, that extend benefits to "native Hawaiians," defined as "any individual whose ancestors were natives of the area which consists of the Hawaiian Islands prior to 1778."[35]

In attempting to "rebut" these legislative reasons, the plaintiffs merely substitute their own views. For example, they argue that the term "native Hawaiian" is not outmoded, that the congressional definition in the Native American Programs Act was a mistake, and that "Hawaiians" as a class are not in need of remedial legislation. Although the plaintiffs might *disagree* with the legislature's bases for line-drawing, it is clear that these bases are rational and reasonably further the legislative purpose.[36]

Finally, the definition of "Hawaiian" not only has a rational basis, but it is also evident that the manner in which the legislature derived the definition is not arbitrary or capricious. This is not a case in which the court has to imagine the bases on which the legislature could or did rely. Rather, the legislative reports detail the careful consideration and social and historical research that underlay the legislature's definitions.[37]

**32.** Hawaii Rev.Stat. § 10–1(a) (Supp.1984).

**33.** *See, e.g.,* Conference Committee Report No. 784, Senate Journal, Session Laws of Hawaii 1979, at 1351–56; Standing Committee Report No. 59, Hawaii Constitutional Convention of 1978, at 8–9.

**34.** Senate Journal, *supra,* at 1351–52.

**35.** *E.g.,* Native Hawaiians Study Commission Act, 42 U.S.C. § 2991a at § 305 (1982); Native American Programs Act of 1974, 42 U.S.C. §§ 2991, 2992c(3) (1982).

**36.** Plaintiffs have not come close to meeting their heavy burden of convincing this court that the legislative bases supporting the definition of "Hawaiian" "could not reasonably be conceived to be true by the governmental decision-maker." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 464, 101 S.Ct. at 724, quoting from *Vance v. Bradley,* 440 U.S. at 111, 99 S.Ct. at 949. This court must uphold the definition if "it is evident from all the considerations presented to [the legislature] that the question is at least debatable." *Clover Leaf Creamery Co.,* 449 U.S. at 464, 101 S.Ct. at 724, quoting from *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed.2d 1234 (1938).

**37.** As an example, the legislature painstakingly documented its reasons for altering the definition found in the unratified constitutional amendments. This latter definition had merely required a person to be a descendant from the races inhabiting the Hawaiian Islands previous to 1778. In order to avoid "cross-migration" and "shipwrecked sailor" problems, the committee considered a proviso that the "descendants thereafter have continued to reside in Hawaii." However, the legislature ultimately altered this slightly to read: "which *peoples* continued to reside there." This change made it clear that "exported talent" and other "expatriates" would not be "deprived of their heritage because the residency of their predecessors in these islands may have been broken by economic circumstances." Standing Committee Report No. 784, Senate Journal, Session Laws of Hawaii, at 1353–54.

In summary, the record clearly supports the rational bases and reasoned decision-making process for the challenged definition.

## C. *Blood Quantum is Not a Prerequisite for a Finding of Constitutionality*

Plaintiffs assert that the definition of "Hawaiian" without regard to blood quantum is unconstitutional because it does not clearly delineate the members of the class.[38] To support this contention, plaintiffs turn to Indian cases. In particular, they seek to rest their case on *Simmons v. Eagle Seelatsee.*[39]

In *Simmons,* heirs of a Yakima Indian were denied their inheritance because they were unable to meet a congressional requirement that heirs be of one-fourth or more Yakima blood. Plaintiffs there asserted that the requirement was unconstitutional because it was based on a criterion of race. In upholding the blood quantum restriction, the *Simmons* court first stressed the plenary power of Congress to legislate with respect to Indian rights, including the power to determine tribal membership. The court then stated:

> It is plain the Congress, on numerous occasions, has deemed it expedient, and within its powers, to classify Indians according to their percentages of Indian blood. Indeed, if legislation is to deal with Indians at all, the very reference to them implies the use of a "criterion of race". Indians can only be defined by their race.
>
> We hold that there was a rational basis for the classification provided in [the legislation]. Necessarily continued intermarriage with white persons would ultimately produce persons who were in no true sense Indians. At some reasonable point a line must be drawn between Indians and non-Indians, between those properly to be regarded as continuing members of the tribe, and those who are not.[40]

Plaintiffs here assert that the above language constitutionally mandates the use of blood quantum requirements. This is to misread the holding of the case and the role of the court in a "rational basis" inquiry. The *Simmons* court upheld the legislation because there was a rational basis for it. The court's ensuing discussion does not require that congressional legislation contain any particular cutoff for determining tribal status; it is only dicta to support the line that Congress drew in the particular instance under consideration.

Indian cases clearly indicate that a minimum blood quantum is not a constitutional prerequisite to valid legislation. The cases highlight the power of Congress to classify Indians for the purpose of entitlements or legislative benefits *as it deems expedient.* Sometimes this classification is based on blood quantum; at other times, however, no reference or no distinctions are made with respect to blood quantum. For example, *Witt v. United States*[41] involved eligibility criteria promulgated by the Department of the Interior to determine Indian entitlement to various land allotments. The criteria contained no minimum blood quantum but required merely that a person be able to "trace *an ancestor* to the Dawes Commission rolls." [42] The Ninth Circuit Court of Appeals upheld the regulations against an equal protection challenge by a person claiming to be of Choctaw descent,

---

**38.** Plaintiffs further contend that there is no "safeguard as to who is not a 'Hawaiian,' on said list. Only a person swears that he is a 'Hawaiian'. The Court is prayed to take judicial notice that people do lie or that people may think that they are 'Hawaiian'...." Plaintiffs' Objections to Motion to Dismiss, Dec. 2, 1985, at 5. This objection does not merit constitutional discussion. Nevertheless, it bears mentioning that OHA uses an elaborate method for tracing aboriginal ancestry to determine whether a person is "Hawaiian." Furthermore, there is no greater likelihood that a person would lie about his or her Hawaiian status than native Hawaiian status.

**39.** 244 F.Supp. 808 (E.D.Wash.1965), *aff'd,* 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480 (1966).

**40.** 244 F.Supp. at 814–15.

**41.** 681 F.2d 1144 (9th Cir.1982).

**42.** *Id.* at 1148 (emphasis supplied).

but who could not meet the eligibility criteria. The court reasoned that Congress has the power to define who is an Indian for allotment purposes, and that the criteria, which ensured that benefits were not extended to non-Indians, were rationally tied to the fulfillment of Congress' unique obligations to Indians.[43]

■ Thus, Indian cases provide no support for plaintiffs' assertion that a half-blood quantum, or indeed any blood quantum, provides a magic formula for a determination of constitutionality. Rather, the cases exhibit substantial deference to Congress to classify Indians in any reasonable manner it may choose. The Hawaii legislature has similar latitude to define "Hawaiian" without regard to blood quantum in order to further the purposes of its remedial legislation.

### D. *Conclusion*

In its implementing legislation for the Office of Hawaiian Affairs, the legislature has "deemed it expedient" [44] to extend the lines of its beneficiary class beyond those persons who are of fifty percent or more native blood to include all descendants of aboriginal Hawaiians. This court finds that the definition of "Hawaiian" in Hawaii Rev.Stat. § 10–2(5) has a rational basis and reasonably furthers the legislature's legitimate purpose to address the needs of Hawaii's aboriginal descendants.

THEREFORE IT IS HEREBY ORDERED that the defendants' motion for summary judgment is GRANTED, and the plaintiffs' cross motion for summary judgment is DENIED.

---

**43.** *Id.* at 1149.

See also, e.g., *United States v. First National Bank,* 234 U.S. 245, 34 S.Ct. 846, 58 L.Ed. 1298 (1914) (distinction between full blood and mixed blood of any quantum upheld); *Tiger v. Western Investment Co.,* 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738 (1911) (statute limiting right of conveyance by full blood upheld against due process attack); *Delaware Tribal Business Commission v. Weeks,* 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977) (upholding distribution of money to Cherokee and Absentee Delaware Indians if they could trace a lineal ancestor to tribal rolls, against challenge by legislatively omitted Kansas Delawares). *Cf. United States v. Ferguson,* 247 U.S. 175, 38 S.Ct. 434, 62 L.Ed. 1052 (1918) (upholding use of tribal rolls as determinative of full or mixed blood quantum); *Hy-Yu-Tse-Mil-Kin v. Smith,* 194 U.S. 401, 24 S.Ct. 676, 48 L.Ed. 1039 (1904) (statute applying to "all persons who are in whole or in part of Indian blood or descent").

**44.** *Simmons,* 244 F.Supp. at 814.